DAVID SEBBERSON and PATTI A. SEBBERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sebberson v. Commissioner
Docket No. 5784-83.
United States Tax Court
T.C. Memo 1984-605; 1984 Tax Ct. Memo LEXIS 68; 49 T.C.M. (CCH) 131; T.C.M. (RIA) 84605; November 20, 1984. James D. McCarthy, Jr., and William G. Davidson, III, for the petitioners. J. Darrel Knudtson, for the respondent. TANNENWALD MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $791.00 in petitioners' Federal income tax for the taxable year ended December 31, 1978. In their petition, as amended, petitioners disputed respondent's determination and also claimed an overpayment for said taxable year. The sole issue for decision is whether amounts received by each of petitioners as a teaching assistant are excludable from gross income as a scholarship or fellowship under section 117. [1]
*69 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein. Petitioners resided in College Park, Maryland at the time they filed their petition herein. They timely filed a joint tax return for 1978. During the taxable year 1978, each petitioner was a candidate for a Ph.D. degree in English Literature at the University of Maryland at College Park, Maryland (the University). Each petitioner had received a Masters degree in English Language and Literature. Each petitioner had been a teaching assistant in the English Department of the University since 1975 under annual appointments and held an appointment in such capacity during 1978. Each petitioner engaged in substantially the same activities as a teaching assistant during 1978. As a teaching assistant, each petitioner received $4,286.89 [2] from the University during 1978. Petitioners were paid on a bi-weekly basis. Amounts were withheld for Federal and state income taxes but not for social security taxes. These amounts constituted the bulk of petitioners' monetary receipts and were critically important as a source of funds to enable petitioners to *70 continue their studies. Teaching assistants were paid out of the general funds allocated by the State of Maryland for the operation of the University. Petitioners were paid from funds allocated to the Department of English for instructional programs. The amount of funds so allocated was based upon the need for instructional services by that department. The University administers funds for schorlarships separately from the funds used to pay for instructional services. Teaching assistantships provided for a remission of tuition [3] and a ten-month stipend ranging from $3,800.00 to $4,750.00 depending upon level of experience. A teaching assistant received health insurance benefits, but no sick leave, holiday benefits or retirement benefits were provided. Other fringe benefits which were provided graduate assistants included (1) the right to join the University credit union; (2) suitable work and office space and access to other facilities such as desk and file space, mailboxes, typewriters, telephones and duplicating machines or services; (3) priority *71 in assignments to University housing facilities; (4) the right to purchase a faculty athletic book for University sporting events (which carried with it a reserved seat for football games) and priority for enrollment of their children in the University Summer Sports Program; and (5) access, upon payment of a fee, to the Faculty Club. Teaching assistantships were awarded competitively by the English Department on the basis of prior academic achievement and present and future potential as a teacher. The overall policy of the University was to award graduate assistantships (including teaching) to persons who appeared likely to render a high quality of service to the University by their teaching activities. Financial need was a secondary factor in determining whether a graduate student would be appointed to an assistantship. The University reserved the right to terminate a teaching assistant's appointment for incompetence; the English Department made every effort to salvage teaching assistants who were having difficulty and to exercise the right of termination *72 only as a last resort. Teaching experience, the type of degree program of the teaching assistant, and academic progress of the assistant determined the level of payment to which the assistant was entitled. Increases in payment levels generally reflected a cost of living adjustment as well. During 1978, the English Department had a corps of approximately 90 teaching assistants plus 11 supervisory personnel (the Director of Freshman English and master teachers). The teaching assistants were required to teach 20 hours each week; they were responsible for teaching freshman English to approximately five thousand students. During the spring semester in 1978, each petitioner taught English 101, a course in English composition which was a required course for freshmen. During the next semester, each of the petitioners taught a "module" course in remedial writing for slow learners designated an English 104, 105, and 106, which was not a required course. As teaching assistants, each of petitioners prepared assignments, conducted classes, met with students, and graded examinations (although these were subject to review and final determination by the Director of Freshman English). *73 They were subject to some supervision by the Director of Freshman English, who visited each of their classes once during the second-half semester. The master teacher visited petitioners' classes in the "module" program twice during the semester. The master teacher also met with the teaching assistant weekly, to plan how the module course was to be taught, and before examinations. Teaching was not a formal requirement for a Ph.D. in English Literature although all but one of the Ph.D. candidates held teaching assistantships. Neither of the petitioners received any academic credit for their teaching. ULTIMATE FINDING OF FACT The amounts paid to each of the petitioners as teaching assistants represented compensation for services and not a scholarship or fellowship within the meaning of section 117. OPINION The threshold question, with respect to the applicability of section 117, is whether the payments received by petitioners from the University of Maryland were designed to further their education rather than to compensate them for services, i.e., were they paid to work or study. , affg. per curiam *74 ; , affg. ; . Resolution of this question depend upon the facts of each case and the burden of proof is on the petitioners. ; ; ; Rule 142(a). Admittedly, precise line-drawing in this area is often difficult. See ;Under the foregoing circumstances, no useful purpose would be served by our attempting to dissect the cases cited by the parties. From our evaluation of the entire record, we hold that petitioners were paid to work and that accordingly respondent's determination should be sustained. Petitioners argue strenuously that their teaching assistantships were designed primarily to teach them how to be better teachers after they completed their doctoral programs in accordance with the policy *75 of the English Department. Therefore, they conclude that their teaching was in furtherance of their education and that they were paid to study rather than work. At the outset, we recognize that the objectives of a department of a university may diverge from those of the university as a whole. . But we think that any divergence between the policies of a department and those of the university must be considered in the context of differences in the bases for awarding assistantships, i.e., financial need rather than teaching ability, and the nature of the assistants' activities, including the degree of supervision and control. Compare , with . The fact that teaching experience derived from an assistantship may have been a by-product of the teaching assistantship -- indeed, even a significant by-product -- does not necessarily lead to the conclusion that a teaching assistant is paid to study. Cf. In the instant case, petitioners, as teaching assistants, taught *76 a required freshman English course and a remedial writing course. Petitioners performed the usual functions of a teacher and discharged their duties withminimal supervision and control. Aside from their general statments in their applications that they would not be able to continue their Ph.D. programs without the funds to be received as teaching assistants and the fact that, once the other requirements for an assistantship were met, financial difficulties were taken into account, there is no evidence that financial need was anything more than an incidental consideration in the decisions to award them teaching assistantships. Cf. . Moreover, even if financial need were present as a condition for receiving the teaching assistantships involved herein, this fact would not be determinative. Payments which enable a person to continue his education can be for work rather than for study. The factual foundation in this case is clearly distinguishable from that which existed in , upon which petitioners heavily rely, where there was a high degree of supervision and *77 control in contrast with the minimal supervision and control involved herein. Petitioners were among a group of 90 graduate teaching assistants in the English Department, all of whom appear to have been similarly situated. We are unable to accept the proposition that the use of such a large group of teaching assistants had a primary purpose other than to enable the department to discharge its and the University's obligation to impart knowledge to students -- obligations which but for the teaching assistants would have hadto have been discharged through the employment of other personnel. In so stating, we are mindful that certain supervisory personnel testified that the primary purpose of the teaching assistantships was to train the assistants as future teachers, but when we evaluate their testimony in light of the record as a whole, we are convinced that, while their testimony imparts a training patina, it is insufficient to convince us that petitioners were paid to study rather than to work. Common sense tells us that a graduate assistantship or similar status usually carries with it a training element. Thus, an intern at a hospital is a better doctor because of the *78 training he receives. We reject petitioners' attempt to meet the pay-to-study and not-to-work standard by emphasizing that their purpose in executing their teaching assistantships was to further their education to become teachers.The purpose for which the payments are made and not the purpose of the individual who receives the funds is the critical element in determining whether the requirements of section 117 have been met. . Petitioners also attach importance to the alleged fact that it cost the University more to use them as teaching assistants than it would have costto hire part-time instructors to perform the same functions. Aside from the fact that we are not satisfied on the basis of the record herein that part-time instructors would have been less costly, [4] the existence of a cost differential is not determinative. It is merely one factor to be considered and, in the context of this case, is insufficient to tip the scales in petitioners' favor. *79 In sum, the record herein is insufficient to cause us to conclude that petitioners should be treated any differently than taxpayers in the vast majority of the decided cases dealing with teaching assistants where the payments were held not be be excludable from gross income under section 117. E.g., ; ; ;. [5] We hold that petitioners have not carried their burden of proof that they were paid to study and not to work, with the result that the payments they received do not meet the threshold requirements of section 117. [6]
*80 Our holding makes it unnecessary to address petitioners' alternative argument that a portion of their payments in any event fell within the exception to the limitation contained in section 117(b)(1). See We are constrained to note, however, that the record herein does not support the proposition that teaching was required for all candidates for a Ph.D. in English Literature. Clearly there was no formal requirement of the University or the English Department that all such degree candidates teach. The fact that all candidates, with one exception, did teach and that teaching experience was an element in enabling a candidate to answer some of the questions on the examinations for his or her degree is simply not enough to enable petitioners to fall within the exception to the limitation of section 117(b)(1). The teaching services rendered by petitioners were "in the nature of part-time employment" required as a condition of receiving the payments involved herein. ; , affg. per curiam a Memorandum *81 Opinion of this Court; . Decision will be entered for the respondent.
Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Paragraph 7 of the stipulation uses the figure $5,286.89 but it is clear from the record that this is an error.↩
3. Respondent makes no claim herein that the amount of these remissions were not excludable under section 117.↩
4. It appears that the alleged cost differential derives from the tuition remissions to petitioners. We have serious doubts that the loss of tuition, which would have otherwise been paid by petitioners, is a relevant factor in determining whether a cost differential exists.↩
5. See also ; ; . ↩
6. Petitioners make much of the fact that the University did not withhold social security taxes from the payments made to petitioners. The withholding of income and social security taxes is a peripheral consideration in determining the character of the payments involved herein. .↩